# IN THE COURT OF APPEALS OF IOWA

No. 22-0975
Filed December 7, 2022

**IN THE INTEREST OF J.R.,**
**Minor Child,**

**K.P., Father,**
　　Appellant.
_____


　　Appeal from the Iowa District Court for Polk County, Romonda Belcher, District Associate Judge.


　　A federally incarcerated father appeals the termination of his parental rights to his eleven-year-old son. **REVERSED AND REMANDED.**


　　John Audlehelm of Audlehelm Law Office, Des Moines, for appellant father.

　　Thomas J. Miller, Attorney General, and Ellen Ramsey-Kacena, Assistant Attorney General, for appellee State.

　　Benjamin Bragg of Bragg Law Firm, Clive, attorney and guardian ad litem for minor child.


　　Considered by Tabor, P.J., and Schumacher and Chicchelly, JJ.

**TABOR, Presiding Judge.**

In challenging the termination of his parental rights to his eleven-year-old son, Kenneth invokes the exception allowing a court to preserve the parent-child relationship if a relative has legal custody of the child. Iowa Code § 232.116(3)(a) (2021).[1] Because J.R. is in the legal custody of an uncle, Kenneth contends the juvenile court should have refrained from terminating his rights. He also believes the court glossed over his testimony that he could care for his son after he was released from federal prison. Given the unique circumstances of this case, we find the exception for relative custody should have precluded termination. We thus reverse and remand for further proceedings.

## I. Facts and Prior Proceedings

Ericka gave birth to J.R. in 2011. Two years later, a paternity test established Kenneth as his father. J.R. mainly lived with Ericka and five of his half-siblings in Des Moines.[2] But after Kenneth learned he was J.R.'s father, he testified they became close. "I was always there to keep him around me, go pick him up from Ericka." Kenneth said his son would stay with him "for months" until J.R. "started missing his brothers and sisters so I would take him back." While Ericka and Kenneth had no formal custody agreement, Kenneth told child protection workers investigating abuse by Ericka that he had visitation with J.R.

---

[1] Kenneth also challenges the termination of his parental rights under Iowa Code section 232.116(1)(b), insisting he did not abandon J.R. But the juvenile court terminated his rights on two other grounds that he does not challenge. *See* Iowa Code § 232.116(1)(e), (f). Thus, we may affirm on those grounds without addressing abandonment. *See In re N.S.*, No. 14-1375, 2014 WL 5253291, at *3 (Iowa Ct. App. Oct. 15, 2014) (discussing waiver).

[2] J.R. also has seven half-siblings on Kenneth's side.

Kenneth testified that he took a more active role in J.R.'s life once he started receiving letters and calls from the department about Ericka abusing her children. When J.R. stayed with him for a long time, Kenneth would take him to school, haircuts, and doctor's appointments. Kenneth made sure that J.R. was "properly dressed" and completed his homework. Kenneth testified that he planned to continue this involvement but discovered a federal warrant for his arrest in February 2020. He turned himself in and was transferred to a federal prison in Leavenworth, Kansas.

Then tragedy struck the family. In December 2020, J.R.'s five-year-old half-brother, J.M.R., died from a skull fracture. Investigators did not confirm the cause of the fracture, but they found the child had other injuries consistent with physical abuse all at varying stages of healing. Ericka gave inaccurate information to explain these injuries. Later, law enforcement searched her phone and found videos of her physically abusing J.M.R. The State sought immediate temporary removal. Ericka fled, and the State issued an arrest warrant.

In January 2021, the juvenile court placed J.R. and his four half-siblings in the "temporary legal custody" of their maternal uncle, James, under department supervision. The State moved to adjudicate J.R. and his siblings as children in need of assistance (CINA) a day after their placement. Kenneth was served by mail with the CINA petition in February 2021. The department was able to contact Kenneth that same month to complete a social history report.

In that report, the social worker chronicled Kenneth's substance abuse, including marijuana use dating back to his teens, three years of cocaine use, and a conviction for operating while intoxicated. Kenneth also suffered from post-

traumatic stress disorder (PTSD) stemming from being shot in the head at age seventeen. While in Leavenworth, Kenneth received counseling and planned to obtain substance-abuse treatment if available. The worker also noted Kenneth's long criminal history, including drug possession and parole violations. The worker identified Kenneth's release date as March 2023.

The department recommended that Kenneth participate in any mental-health, substance-abuse, and parenting education services available in prison. The social worker also asked Kenneth to sign releases so she could coordinate services with the prison. The service that Kenneth wanted was visitation; he reminded the worker that J.R had lived with him before. But the worker reported that she would "need a specific order to offer [Kenneth] visits and this will only be done if the prison does not have COVID restrictions."

In response to Kenneth's request, in April 2021 the juvenile court granted the department discretion to arrange visitation between Kenneth and J.R. Yet in all later reports to the court, the social workers continued to say they needed an order to provide Kenneth his requested visitation.

The following December, the social workers reported that Kenneth had not participated in services while in federal prison. That report also revealed that they had not contacted Kenneth since October. Meanwhile, J.R. and his half-siblings were doing well in their uncle's custody. So the department recommended

termination of Kenneth's parental rights.[3]  The juvenile court agreed and directed the State to move for termination.

Before the March 2022 hearing, Kenneth wrote a letter to the department objecting to termination and expressing his interest in remaining in J.R.'s life.  He informed the department that his new release date was September 2022.[4]  After receiving his letter, the social worker called Kenneth's counselor at Leavenworth to "set up a time to speak with him."  She was "only able to leave a voice message."  She never heard back and made no further effort to reach Kenneth.

And it was not just the social workers who failed to reach Kenneth.  His federal incarceration made it difficult for his attorney and the guardian ad litem (GAL) to contact him.  This barrier limited the attorney's ability to advocate for Kenneth's interests or contest reasonable efforts—such as the lack of visitation.  So great was this difficulty that as of the March 2022 termination hearing, Kenneth's attorney had never spoken to him.  His attorney told the court:

> In my career, I've never had such trouble getting a hold of someone in a prison.  He's in Leavenworth.  I've called Leavenworth multiple times.  I know the department has as well.  Either you leave a message and no one calls you back, or the number just rings and no one picks up.  And there's a general e-mail address you can e-mail, and no one responds to it.

The State too faced issues in contacting Kenneth.  It could not verify he had been served with notice of the termination proceedings.  Thus, the court continued the hearing as to Kenneth but went forward with evidence on the other parents.

---

[3] The department also recommended the rights of the mother and three other fathers be terminated.  A fifth father had followed the case plan, so the department favored preserving his parental rights.
[4] Kenneth testified at his termination hearing that his sentence could end earlier than September 2022 if he spent one month at a halfway house.

The court commented that because the children were with relatives, a delay would not cause them harm.

Less than a month later, the State verified that Kenneth had been served notice. He appeared by video conference a day later. It was the first time he had participated in the CINA or termination proceedings. His testimony outlined his efforts to maintain a relationship with J.R. from behind bars. For instance, Kenneth wrote letters to J.R. from prison in 2020 and 2021, sending them to the department.[5] When he never heard back, he stopped writing. Kenneth also recruited his fiancée and the mother of one of his other children to contact the department about the letters. But, according to his testimony, the department never responded. Kenneth also testified that his fiancée contacted James to express Kenneth's appreciation that the uncle was taking care of J.R.

As for the future, Kenneth told the court that he and his fiancée have a house in Des Moines and he plans to return there after finishing his sentence. "When I get released, I was hoping to get my son, to take care of my son, and that's why I bought me a house so [J.R.] would have somewhere to go." Once released, he hopes to find a part-time job to supplement the disability income he receives as a result of his head injury.[6]

In closing argument, Kenneth's attorney asked the court to apply a statutory exception for termination. The attorney reiterated the difficulties of communicating

---

[5] Kenneth described their content: "[J.R.], he's very smart. He's very intelligent, so I wrote a letter to him to let him know that I still love him and I was going to take care of him as possible that I can."

[6] Kenneth also testified that he was federally incarcerated for "possession of ammunition." But a review of the record suggests his conviction was for drug possession with intent to deliver.

with his client in federal prison: "He's been doing everything he can. He sent letters as often as he could. And . . . the first time he's hearing from his attorney is when [he's] probably going to lose [his] rights."

The juvenile court also heard from J.R.'s GAL. He acknowledged that Kenneth was "reasonably involved" in J.R.'s life—as compared to the other fathers in the case. But the GAL still recommended termination, reasoning that "we need permanency, especially considering what these kids have been through." When the court asked about the child's wishes about termination of his father's rights, the GAL had no answer: "I have not discussed it with him." Given that missing information, the court left the record open. The GAL later reported that he asked J.R. "whether he would object to these termination proceedings, or if he wanted to continue living with his maternal uncle." The GAL informed the court that J.R. "did not object to the termination" and wanted to continue living with his uncle. The GAL's filing included no details about how J.R. viewed his relationship with his father.

A month after the hearing, Kenneth sent a letter to the court asking about the status of his parental rights.[7] He complained that his attorney had not reached out to him since the hearing. A few days later, the court issued its termination order.[8] Kenneth now appeals.

---

[7] Kenneth bemoaned: "There's only so much I can do in here so my next step was to write you this letter." He told the court that he was "a concerned father" who would love to have his son in his life. It is unclear from the record when the court saw the letter, but it was filed with the clerk's office in June, after the court filed its termination order.

[8] The order also terminated the rights of Ericka and three other fathers. They are not parties to this appeal.

## II. Analysis

We review termination proceedings de novo. *In re Z.P.*, 948 N.W.2d 518, 522–23 (Iowa 2020). We give weight to the juvenile court's factual findings but do not consider them binding. *Id.* Once the State proves grounds for termination, the juvenile court must decide whether any factor in section 232.116(3) advises against ending the parent-child relationship. *In re B.M.*, No. 13–1704, 2013 WL 6700309, at *4 (Iowa Ct. App. Dec. 18, 2013). It is the parent's burden to show a factor exists. *In re A.S.*, 906 N.W.2d 467, 476 (Iowa 2018). And even when a factor does exist, the court still may decide whether it precludes termination of the parent-child relationship. *See id.* at 475 (reiterating these factors are permissive, not mandatory). In deciding whether to save the relationship, we look to the unique circumstances of the case and best interests of the child. *In re M.W.*, 876 N.W.2d 212, 225 (Iowa 2016) (citation omitted).

One factor a court can consider is whether a relative has legal custody of the child. *See* Iowa Code § 232.116(3)(a). Kenneth contends the juvenile court should have declined to terminate because J.R. and his siblings are in the legal custody of their maternal uncle.

As a starting point, we look to the language of that statute. It requires the parent to prove that a relative has "legal custody" of a child. *Id.* Chapter 232 does not include a definition for "legal custody." *See Id.* § 232.2. But our supreme court has held that it means more than placement with relatives when the department has "legal custody." *See In re A.B.*, 956 N.W.2d 162, 170 (Iowa 2021) (citing *In re*

*A.M.*, 843 N.W.2d 100, 113 (Iowa 2014)).[9]  Adding a bit more flesh to the bone, the justices decided that when a child is placed in the "temporary custody" of a relative, the exception is in play.  *A.S.*, 906 N.W.2d at 476 (holding parent failed to establish that grandparents' temporary custody of child should preclude termination).

Like *A.S.*, the juvenile court placed J.R. in the "temporary legal custody" of his maternal uncle under supervision of the department.[10]  On appeal, the State does not contest Kenneth's proof that a relative had "legal custody" under section 232.116(3)(a) (2021).[11]  So we assume that the juvenile court had discretion to forgo termination under this exception.

Kenneth acknowledges the juvenile court had to deal with the reality of his incarceration.  But he contends it should have given "more consideration" to his

---

[9] Our court recently explored the distinction between legal custody and placement by examining various orders in a CINA case but did not resolve the issue.  *In re M.G.*, No. 22-0004, 2022 WL 1100281, at *2 n.2 (Iowa Ct. App. Apr. 13, 2022).

[10]  Under Iowa Code section 232.102(1)(a), the juvenile court had the option of transferring the child's legal custody to (1) a parent, other relative, or other suitable person (2) a suitable private agency or institution, or (3) the department.  Effective July 2022, the juvenile court may transfer legal custody to a parent or to the department for placement with an adult relative, fictive kin, or other suitable care providers.  Iowa Code § 232.102(1)(a) (2022).  This code change may limit the future applicability of Iowa Code section 232.116(3)(a).

[11] The State does make a blanket objection to error preservation, noting it lacked access to the transcript when responding on appeal.  Although at the hearing Kenneth's attorney did say in passing that he didn't "think" the factor at (3)(a) applied, he did argue for a permissive exception and the court did rule on the factor. So we address it.  *In re A.W.*, No. 18-0466, 2018 WL 2722789, at *3 (Iowa Ct. App. June 6, 2018).

commitment to J.R. because the child remained in the custody of a stable relative. After our de novo review of the record, we agree.

Overall, the juvenile court engaged in a thorough analysis of the grounds for termination. But the court lumped all the parents together when doing so. It first discussed "the parents' abandonment and lack of any meaningful relationships and engagement in services." It next turned to Ericka's physical abuse and neglect of J.R. and his half-siblings. And then the court discussed "the length of time the children have been out of the home and their need for permanency."

What was missing was a separate examination of Kenneth's unique situation. Kenneth gave unchallenged testimony outlining his significant role in parenting J.R. before going to federal prison. Kenneth maintained regular visitation with J.R., sometimes caring for the child for months at a time. He took J.R. to school, appointments, the barber, and provided for him financially. Once incarcerated, Kenneth tried to remain in J.R.'s life. He wrote letters to J.R. for two years, sending them through the department. When he received no response, he asked others to contact the department to ensure J.R. received his letters. Kenneth also had his fiancée thank James for assuming custody of J.R. and pass on his wishes to take over care once released.

We recognize that parents cannot use their incarceration as an excuse for a lack of relationship with their children. *In re B.H.A.*, 938 N.W.2d 227, 234 (Iowa 2020). But the State points to no evidence contesting the strength of the relationship between Kenneth and J.R. before Kenneth started serving his sentence. Nor does the State suggest what else Kenneth could have done to maintain that relationship while in federal prison. J.R.'s GAL recognized as much,

telling the court Kenneth seemed "more than willing" to be a parent and had been "reasonably involved" in J.R.'s life.

Next, we find Kenneth embraced every opportunity for services despite the department's lack of effort. The department recommended that Kenneth participate in any prison-provided mental-health, substance-abuse, and parenting education services and sign releases for service coordination. Kenneth informed the department that he was receiving mental-health counseling and pursuing other services in prison. Yet the department reported that Kenneth had no opportunity for services because of his federal incarceration. On the flip side, Kenneth requested visitation with J.R., and the juvenile court placed discretion with the department to provide it.

When an incarcerated parent seeks visitation, the department must determine whether it is a reasonable reunification service. *See In re S.J.*, 620 N.W.2d 522, 525 (Iowa Ct. App. 2000) (listing these factors: child's age, bonding with parent, clinical recommendations concerning visitation, nature of parenting deficiencies, physical location of child and parent, limitations of place of confinement, services available in prison, nature of offense, and length of parent's sentence). This record shows no compliance with the *S.J.* mandate. Instead, department staff continued, in every report, to request an already-issued order approving visitation.

What's more, Kenneth contacted the department to express his desire to be a part of J.R.'s life and informed the workers of his new September 2022 release date. The department responded by making one unanswered phone call to the prison. Despite the department's lack of follow up, the juvenile court made no

individualized assessment of Kenneth's situation, instead finding: "The respective fathers subject to this petition have not engaged in services."

True, Kenneth did not expressly raise a reasonable-efforts challenge.[12] But it is still the department's statutory duty to provide services. *In re K.W.*, No. 22-1178, 2022 WL 11123161, at *1 n.1 (Iowa Ct. App. Oct. 19, 2022). On this record, we disagree with the juvenile court's order faulting Kenneth for not engaging in services.

Which brings us to the heart of the matter. Should relative custody have precluded termination of Kenneth's rights—considering how long J.R. has been out of parental care and his need for permanency? While time is of the essence in achieving permanency for children like J.R., we cannot forget the competing principle that "termination is an outcome of last resort." *In re B.F.*, 526 N.W.2d 352, 356 (Iowa Ct. App. 1994). "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Santoksky v. Kramer*, 455 U.S. 745, 753 (1982). The push for permanency is less compelling here because J.R. will continue to remain in the legal custody of his uncle. *See B.M.*, 2013 WL 6700309, at *4.

We might agree with the juvenile court's refusal to refrain from termination based on the relative placement if Kenneth had not acted in the role of an active

---

[12] It is no surprise he did not do so. Kenneth's attorney could not reach him at Leavenworth until the termination proceedings. On appeal, his attorney requests that "[a]ny failure on [Kenneth's] part to state his wishes prior to the termination hearing should reflect negatively on either USP Leavenworth or the undersigned counsel, but not him directly." We agree.

parent before going to prison. *See B.H.A.*, 938 N.W.2d at 234 (holding father's "chosen lifestyle was at the expense of a relationship with [his son] as illustrated by his abandonment well before any incarceration"). But Kenneth *did* build a meaningful father-son relationship before his federal incarceration. And his actions throughout these proceeding show that he cares deeply for J.R. Despite being largely cut off from his attorney, the department, and his son, Kenneth persisted in communicating his desire to remain in his son's life.

Kenneth testified to his expected release in September 2022, just five months after the termination hearing. *Cf. In re J.T.*, No. 15-0072, 2015 WL 1332172, at *2 (Iowa Ct. App. Mar. 25, 2015) (refusing to apply factor (3)(a) because of the father's fifteen-year federal prison sentence). He has a source of income and a home with his fiancée near where J.R. is now living with his uncle. And Kenneth expressed his appreciation for James caring for J.R., showing a willingness to work together in J.R.'s best interests. *See In re B.T.*, 894 N.W.2d 29, 34 (Iowa Ct. App. 2017).

Granted, Kenneth has a criminal record, a history of substance abuse, and suffers from PTSD. But he has now been federally incarcerated for two years. He informed the department that he received counseling while in prison and would pursue other prison-run services. And the State presented no evidence that substance abuse was a continuing concern. *See id.* (applying factor (3)(a) negated need for termination of the rights of parent with history of substance abuse; highlighting parent's years of sobriety and new treatment program); *In re N.H.-B.*, No. 11-0556, 2011 WL 2420857, at *7 (Iowa Ct. App. June 15, 2011) (applying

factor (3)(a) to prevent termination when parent tested substance free for drugs over a year).

In the frenzy of addressing Ericka's abuse and neglect of the children, and the situations of five fathers, the department and the court overlooked Kenneth's potential for parenting. Focusing on Kenneth's relationship with J.R., we are unwilling to assume the child's long-term nurturing and growth would be best served by termination of his father's parental rights. *See* Iowa Code § 232.116(2). We believe giving Kenneth a better opportunity to show that he can resume his parenting duties now that he has been released from prison furthers J.R.'s best interest. We find that section 232.116(3)(a) negates the need for termination.

We understand that J.R. did not object to the termination and wants to keep living with his siblings. But we are not ordering J.R.'s immediate return to Kenneth's care. After the remand, J.R. will remain a CINA in the temporary legal custody of his uncle. Meanwhile, the department must provide Kenneth with visitation and other reasonable reunification services.

We reverse the court's order terminating Kenneth's parental rights to J.R. and remand the case for further CINA proceedings so that the department can make efforts toward reunifying the child with his father.[13]

**REVERSED AND REMANDED.**

---

[13] The State spends much of its response to the petition on appeal arguing against the formation of a guardianship for J.R. But Kenneth does not assert that a guardianship is necessary. And we do not direct the juvenile court to that permanency option.